1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11   CARLOS AUGUSTINE,                         No.  1:23-cv-00520-SAB (PC)

12              Plaintiff,                      ORDER DIRECTING CLERK OF COURT TO
                                                RANDOMLY ASSIGN A DISTRICT JUDGE
13        v.                                    TO THIS ACTION

14   HEATHER SHIRLEY, et al.,.                  FINDINGS AND RECOMMENDATIONS
                                                RECOMMENDING DEFENDANTS'
15              Defendants.                     MOTION FOR SUMMARY JUDGMENT BE
                                                GRANTED
16
                                                (ECF No. 24)
17

18        Plaintiff is proceeding pro se and in forma pauperis in this action filed pursuant to 42

19   U.S.C. § 1983.

20        Currently before the Court is Defendants' motion for summary judgment, filed December

21   13, 2024.  (ECF No. 24.)

22                                      **I.**

23                             **RELEVANT BACKGROUND**

24        This action is proceeding on Plaintiff's deliberate indifference claim against Defendants

25   Heather Shirley, James Cronjager, and Scott DeGough relating to alleged contaminated water at

26   Wasco State Prison.  (ECF No. 12.)

27        Defendants filed an answer to the operative second amended complaint on December 7,

28   2023.  (ECF No. 16.)

                                            1

1    On January 5, 2024, the Court issued the discovery and scheduling order.  (ECF No. 20.)

2    After receiving an extension of time, Defendants filed the instant motion for summary

3    judgment on December 13, 2024.[1]  (ECF No. 24.)

4    On January 27, 2025, Plaintiff filed a notice of change of address.  (ECF No. 26.)

5    On March 18, 2025, the Court directed the Clerk to serve a copy of Defendants' motion

6    for summary judgment at Plaintiff's most recent address of record.  (ECF No. 27.)

7    Plaintiff has not filed an opposition to Defendants' motion for summary judgment and the

8    time to do so has passed.  Local Rule 230(l).

9    **II.**

10    **LEGAL STANDARD**

11    **A.    Summary Judgment Standard**

12    Any party may move for summary judgment, and the Court shall grant summary judgment

13    if the movant shows that there is no genuine dispute as to any material fact and the movant is

14    entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted);

15    Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position,

16    whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular

17    parts of materials in the record, including but not limited to depositions, documents, declarations,

18    or discovery; or (2) showing that the materials cited do not establish the presence or absence of a

19    genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.

20    Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the

21    record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen

22    v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v.

23    Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

24    In judging the evidence at the summary judgment stage, the Court does not make

25    credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509

26    _____

27    [1] Concurrently with the motion for summary judgment, Defendant served Plaintiff with the requisite notice of the
requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland,

28    154 F.3d 952, 960-61 (9th Cir. 1998).

F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.**

**DISCUSSION**

A.    **Summary of Plaintiff's Complaint**

Plaintiff alleges the water system at Wasco State Prison recently failed the drinking water standard.

On or about December 14, 2017, Defendants Scott DeGough, J. Cronjager, and Heather Shirley became aware that the water wells at Wasco were contaminated with high levels of Trichloropropane (TCP) and failed the drinking standards for human consumption.  TSP is a chemical contaminant that can cause physical harm and cancer if consumed.  Plaintiff alleges a report set a three-year deadline for Defendants to correct the contaminated water, but they have failed to do for almost seven years.  Plaintiff also claims that Defendant Shirley failed to provide inmates with safe drinking water for consumption and Defendant DeGough has done nothing to fix the problem.  As a result, Plaintiff  is currently suffering from abdominal pain, kidney irritation, pain during urination, dry mouth, sore throat, and vomiting.

///

///

///

3

1    **B.**  **Statement of Undisputed Facts[2,3]**

2    1.  Plaintiff is a California inmate in the custody of the California Department of

3 Corrections and Rehabilitation (CDCR). Plaintiff has been incarcerated at Wasco State Prison

4 since January 10, 2023.  (Declaration of Carolyn G. Widman (Widman Decl.) ¶ 3, Ex. B ¶ 4, Ex.

5 C., Pl. Dep. at 19:12-14.)

6    2.  Defendant Shirley was the Acting Warden of Wasco State Prison in November

7 2020 and the Warden from June 2022 to January 16, 2024.  (Declaration of Heather Shirley

8 (Shirley Decl.) ¶ 2.)

9    3.  Defendant Cronjager became Wasco State Prison's Associate Warden in 2013 and

10 retired on December 30, 2021.  (Declaration of James Cronjager (Cronjager Decl.) ¶ 2.)

11    4.  At all relevant times, Defendant DeGough was the Correctional Plant Manager at

12 Wasco State Prison that oversees the maintenance of physical plant operations and construction

13 projects at Wasco State Prison.  (Declaration of Scott DeGough (DeGough Decl.) ¶ 2.)

14    5.  1, 2, 3 – TCP is a manmade chlorinated hydrocarbon that is

15 Typically used as an industrial solvent and as a cleaning and degreasing agent.  (Declaration of

16 Durrani (Durrani Decl.) ¶ 15.)

17    6.  In 1992, TCP was added to the list of chemicals known to the State of California to

18 cause cancer under California's Safe Drinking Water and Toxic Enforcement Act. In 1999, the

19 California State Water Quality Control Board established a 0.005 ug/L drinking water notification

20 level for TCP.  (Durrani Decl. ¶ 16.)

21    7.  There is no federal MCL for TCP in drinking water, but the U.S. Environmental

22 Protection Agency requires many large water utilities to monitor for TCP with a minimum

23 reporting level of 0.03 ug/L. Some states have established their own MCLs. For example, Hawaii

24

25 [2] Hereinafter referred to as "UF."

26 [3] Because Plaintiff did not file an opposition to Defendant's motion, the Court was left to compile the summary of undisputed facts from Defendant's statement of undisputed facts and Plaintiff's verified complaint.  A verified

27 complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754

28 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).

1    established a state MCL of 0.6 ug/L.  (Durrani Decl. ¶ 19.)

2        8.      In December 2017, a California regulation established a much more stringent

3    MCL of 0.005 ug/L. The regulation went into effect on January 1, 2018. The regulation also

4    required all water systems in California to conduct quarterly monitoring for TCP in water sources.

5    (Durrani Decl. ¶ 19; DeGough Decl. ¶ 4; Cronjager Decl. ¶ 3.)

6        9.      Wasco State Prison's water was tested quarterly by an independent laboratory,

7    Environmental Agricultural Analytical Chemists, as required by the regulation.  (DeGough Decl.

8    ¶ 6 Ex. A at 36-42, 46-52, 56-65, 69-73, 91-95, 99-105, 109-116, 120-126.)

9        10.     Since January 2023 (when Plaintiff arrived at Wasco State Prison), eight quarterly

10   tests have been conducted, the latest in October 2024. The TCP levels were as follows: 2023: 1st

11   Quarter:.008-.008 ug/L; 2nd Quarter: .008-.011 ug/L; 3rd Quarter: .007-.012 ug/L; 4th Quarter:

12   .000-.006 ug/L.  2024: 1st Quarter .000-.000 ug/L; 2nd Quarter: .009-.021 ug/L; 3rd Quarter .000-

13   .009 ug/L; 4th Quarter: .008-.016 ug/L.  (DeGough Decl. ¶ 6 Ex. A at 36-42, 46-52, 56-65, 69-73,

14   91-95, 99-105, 109-116, 120-126.)

15       11.     Notices reporting the independent laboratory's findings were posted throughout

16   the institution for each quarter that the TCP levels in Wasco State Prison's water exceeded the

17   MCL.  (DeGough Decl. ¶ 7, Ex. A at 29-32, 84-87; Cronjager Decl. ¶ 4; Shirley Decl. ¶ 8.)

18       12.     Defendant DeGough was listed as the point of contact for more information.

19   (DeGough Decl. ¶ 7, Ex. A at 29-32, 84-87.)

20       13.     Defense expert, medical toxicologist Timur Durrani, M.D., M.P.H, reviewed

21   relevant literature, Wasco State Prison's water records, Plaintiff's complaint, Plaintiff's

22   deposition transcript, and Plaintiff's medical records from October 2015 through July 2024.

23   (Durrani Decl. ¶ 20.)

24       14.     On May 9, 2023, Plaintiff reported to a registered nurse that he had stomach pain,

25   dry mouth, and blood in his urine the week before.  He was noted to be taking antacids and saliva

26   substitute tablets. Plaintiff was unable to provide a urine specimen.  (Durrani Decl. ¶ 26.)

27       15.     Plaintiff denied having a sore throat after exposure to TCP on March 22, 2023,

28   September 22, 2023, January 18, 2024, and July 10, 2024.  (Durrani Decl. ¶ 26.)

16.     Dr. Durrani calculated Plaintiff's maximum daily ingestion of TCP as 0.000001074918567 mg/kg/day, based on Plaintiff's self-reported ingestion of 5 quarts of water per day and body weight of 92.1 kg.  (Durrani Decl. ¶¶ 21-22; Pl. Dep. 25:17-20.)

17.     As part of California's TCP MCL regulation, California designated Granular Activated Carbon (GAC) treatment as the best available technology for TCP removal.  (DeGough Decl. ¶ 10.)

18.     Activated carbon treatment requires installation of several large vessels containing thousands of pounds of activated carbon.  (DeGough Decl. ¶ 10.)

19.     As water passes through the vessels, the TCP attaches to the carbon granules and filters out of the water.  (DeGough Decl. ¶ 10.)

20.     Defendant DeGough worked with the State Water Resources Board to come up with a Corrective Action Plan, which included a Capital Outlay Budget Change Proposal to install a GAC filtration system.  (DeGough Decl. ¶ 12.)

21.     Wasco State Prison's Warden at the time, John Sutton, signed off on the plan, which was submitted to the State Water Resources Board and submitted the GAC construction project to the Facility Asset Management Branch on August 31, 2018.  (DeGough Decl. ¶ 12.)

22.     According to the Capital Outlay Budget Change Proposal, the estimated cost of installing the GAC system was $1,017,100.00.  (DeGough Decl. ¶ 12, Ex. A at 26-28.)

23.     Defendant DeGough did not participate further in planning or implementing the Corrective Action Plan. Once the Corrective Action Plan was submitted, Defendant DeGough had no authority to do anything regarding Wasco State Prison's water supply except issue quarterly notices when the TCP levels in the water system exceeded the MCL.  (DeGough Decl. ¶ 13.)

24.     Between August 2018 and April 2021, the Facilities Management Group reviewed and researched the proposed Corrective Action Plan.  (DeGough Decl. ¶ 14, Ex. A at 127-137.)

25.     On April 20, 2021, the Facilities Management Group received final drawings and specifications approval and initiated the bid process for the proposed GAC system.  (DeGough Decl. ¶ 14, Ex. A at 137.)

///

26.     In September 2021, the Facilities Management Group submitted contract documents to CDCR's Office of Business Services (OBS).  (DeGough Decl. ¶ 15, Ex. A at 139.)

27.     By May 5, 2022, CDCR accepted W.M. Lyles Construction's bid to install the GAC system.  (DeGough Decl. ¶ 16, Ex. A at 140-141.)

28.     Construction began on November 1, 2022.  (DeGough Decl. ¶ 17, Ex. A at 142.)

29.     By July 24, 2023, foundation excavation, underground utilities, and piping installation had begun.  (DeGough Decl. ¶ 18, Ex. A at 53.)

30.     By January 29, 2024, the cement foundation was completed, and the GAC vessels were set with partial piping and valving. However, inclement weather delayed completion of construction.  (DeGough Decl. ¶ 19, Ex. A at 88.)

31.     The influent and effluent piping was installed by April 24, 2024.  (DeGough Decl. ¶ 20, Ex. A at 96.)

32.     By August 7, 2024, the installation of Variable Frequency Drives was in progress. (DeGough Decl. ¶ 21, Ex. A at 106.)

33.     As of November 4, 2024, the Variable Frequency Drives are operational, and the chlorination and bacterial testing of the GAC vessels and related piping has been completed. The GAC installation project was 95% complete with vessel loading and activation of the GAC system scheduled to follow.  (DeGough Decl. ¶ 22, Ex. A at 117.)

34.     Defendant Shirley had very little involvement or responsibility in responding to Wasco State Prison's TCP levels.  (Shirley Decl. ¶¶ 5-7.)

35.     Defendant Shirley had no authority to authorize a project the size of the TCP removal plant.  (Shirley Decl. ¶ 6.)

36.     When Defendant Shirley became the Acting Warden in November 2020, CDCR and Wasco State Prison had already determined that the best approach to bringing the water into compliance with the MCL would be to install the GAC system.  (Shirley Decl. ¶ 6.)

37.     Defendant Shirley deferred to the expertise of Wasco State Prison's plant operations staff and CDCR staff on matters regarding TCP compliance. The staff working on the

///

7

1  GAC project regularly reported the progress of the project to Defendant Shirley. (Shirley Decl. ¶

2  7.)

3       38.    While she was acting Warden and Warden, Defendant Shirley and her staff

4  transmitted quarterly water tests to the State Water Resources Board, posted quarterly notices

5  required by regulation regarding the TCP levels, and provided annual consumer confidence

6  reports regarding the quality of Wasco State Prison's water. (Shirley Decl. ¶ 8.)

7       39.    While Defendant DeGough was listed as the point of contact on the quarterly

8  water notices to Wasco State Prison inmates, the notices are templates provided by the State

9  Water Resources Board and the TCP levels are based on an independent laboratory's findings.

10  (DeGough Decl. ¶¶ 7-8.)

11       40.    Defendant Cronjager's responsibilities as Associate Warden included, but were not

12  limited to, supervising the overall operations of Wasco State Prison's physical plant. (Cronjager

13  Decl. ¶ 2.)

14       41.    However, Defendant Cronjager is not a water expert, and it was not part of his job

15  duties or responsibilities to investigate or second guess independent laboratory findings or the

16  State Water Resources Board's information concerning Wasco State Prison's TCP levels.

17  Further, he was not personally involved in the day-to-day activities of plant operations staff he

18  supervised. Rather, Defendant Cronjager relied on their expertise to work with CDCR's Facility

19  Planning, Construction and Management division to come up with a plan to treat the water to

20  bring it into compliance with state regulation. (Cronjager Decl. ¶ 5.)

21       42.    Plaintiff testified at his deposition that in early 2024, he began buying bottled

22  water from the canteen. (Pl. Dep. at 25:23-25, 26:1-21, 35:2-9; 59:13-22.)

23       43.    Plaintiff tries to buy 24 water bottles per month to avoid drinking Wasco State

24  Prison's water. (Pl. Dep. at 51:1-3; 52:2-11.)

25       44.    Plaintiff testified that he has only drunk Wasco State Prison's water twice since he

26  began buying bottled water from the canteen. (Pl. Dep. at 54:4-15.)

27  ///

28  ///

1

## C.    Analysis of Defendants' Motion

As previously stated, Plaintiff contends that Defendants were deliberately indifferent to his safety because he was exposed to contaminated water resulting in harm.

Defendants argue that the undisputed facts show that Defendants did not violate Plaintiff's Eighth Amendment rights when Plaintiff consumed water at Wasco State Prison that was safe to drink, but contained concentrations of 1, 2, 3, TCP above the regulatory maximum contaminant level. Defendants also argue they are entitled to qualified immunity.

"While conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.' " Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). The Eighth Amendment, which protects prisoners from inhumane conditions of confinement, Farmer v. Brennan, 511 U.S. 825, 833 (1994), is violated when prison officials act with deliberate indifference to a substantial risk of harm to an inmate's health or safety. Farmer, 511 U.S. at 828; Thomas v. Ponder, 611 F.3d 1144, 1151–1152 (9th Cir. 2010); Richardson v. Runnels, 594 F.3d 666, 672 (9th Cir. 2010).

Two requirements must be met to show an Eighth Amendment violation. Farmer, 511 U.S. at 834. First the deprivation must be, objectively, sufficiently serious. Id.  Second, prison officials must have a sufficiently culpable state of mind, which for conditions of confinement claims is one of deliberate indifference. Id. Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. Id. at 837.

Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.' " Id. at 1057 (quoting Farmer, 511 U.S. at 837)). " 'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.' " Toguchi, 391 F.3d at 1057.  The exposure to toxic substances can support a claim under section 1983. See Wallis v. Baldwin, 70 F.3d 1074, 1076–1077 (9th Cir 1995)(exposure to asbestos).

9

1    The interpretation of medical test results and the evaluation of such results in the context
2    of exposure to unreasonably high arsenic levels require medical and/or toxicological expertise.
3    Fed. R. Evid. 701, 702. The issue is not whether there is arsenic in drinking water, but at what
4    contaminant level the water becomes unsafe to drink, whether a named defendant was aware of a
5    substantial risk to inmate health due to the contaminant level, and whether the prisoner's medical
6    issues were caused by arsenic exposure.   See Nguyen v. Biter, No. 1:11-cv-00809-AWI-SKO
7    (PC), 2015 WL 5232163 (E.D. Cal. Sept. 8, 2015) (in prisoner civil rights action alleging KVSP
8    drinking water contained arsenic, defendants granted summary judgment on objective prong of
9    Eighth Amendment claim because, although there was arsenic in the local drinking water,
10    prisoner provided no scientific evidence that the arsenic was present in sufficient amounts to
11    cause the skin and other conditions he complained of, and there was no medical evidence that his
12    conditions were specific to arsenic exposure).  In order to survive a motion for summary
13    judgment, Plaintiff is  required to show that his medical conditions were caused by arsenic
14    exposure.

15        1.    Objective Element-Substantial Risk of Serious Harm

16    Prison officials cannot ignore a condition of confinement "that is sure or very likely to
17    cause serious illness." Helling v. McKinney, 509 U.S. at 33. The inquiry requires establishing that
18    a serious harm existed, and there was a substantial risk of suffering that harm. The minute
19    possibility that something may cause serious harm, such as disease, in the abstract does not
20    establish a substantial risk unless the risk of developing the disease is substantial. Lopez v.
21    McGrath, No. C 04-4782, 2007 WL 1577893, at *13 (N.D. Cal. May 31, 2007) (discussing
22    whether risk of developing MRSA was a substantial risk). Plaintiff must prove that he was
23    exposed to an unreasonably high level of arsenic. Helling, 509 U.S. at 35.

24    Defendants have presented evidence that Wasco State Prison's water did not present an
25    objectively serious risk of harm.  Wasco State Prison's water contained concentrations of TCP
26    between .000 ug/L and .016 ug/L. (UF 10.)  Simply because Wasco State Prison's water exceeded
27    the state's new regulatory MCL does not create a genuine issue of disputed fact. Violations of
28    environmental regulatory standards are not tantamount to a constitutional violation. Reed v.

1    Harrington, No. 1:11-CV-01883, 2013 WL 1627622, at *3 (E.D. Cal. Apr. 15, 2013); Robinson v.

2    Gonzalez, No. CV 11-5639, 2012 WL 405006, at *11 (C.D. Cal. Feb. 7, 2012). That is

3    particularly true where, as here, the water was still safe to drink.

4           Defendants' expert witness, Dr. Durrani, a medical toxicologist opines that there is no

5    evidence showing that the levels of TCP in Wasco State Prison's water caused Plaintiff's alleged

6    medical conditions.  (DUF 15, 17, 20-26.)  Dr. Durrani opined that Wasco State Prison's water

7    did not have high enough TCP concentrations to cause harm because the water was safe to drink.

8    (Durrani Decl. ¶ 29.)

9           Notices reporting the independent laboratory's findings were posted throughout the

10   institution for each quarter that the TCP levels in Wasco State Prison's water exceeded the MCL.

11   (UF 11.)  Quarterly notices also informed inmates and staff that the amount of TCP in Wasco

12   State Prison's water did not present an emergency.  (DeGough Decl. ¶ 6, Ex. A at 7-186;

13   Cronjager Decl. ¶ 4.)  In addition, the notices informed inmates and staff that they did not need to

14   use an alternative water source, and the prison was not ordered to provide an alternative source of

15   water while the GAC system was under construction and the TCP exceeded the MCL.

16   (DeGough Decl. ¶¶ 6, 23-25, Ex. A at 7-186; Cronjager Decl. ¶¶ 4, 6-7; Shirley Decl. ¶ 9.)

17          With respect to Plaintiff's medical conditions, Plaintiff testified at his deposition that no

18   doctor has ever diagnosed his conditions as being caused by his consumption of Wasco State

19   Prison's water. (Pl. Dep. at 37:2-12.)  Moreover, Dr. Durrani attested that Plaintiff did not

20   become ill from ingesting the arsenic concentrations in Wasco State Prison's drinking water and

21   he will not suffer any future health issues.  (Durrani Decl. ¶¶ 20-29.)

22          Furthermore, Plaintiff has failed to demonstrate that the risk of arsenic exposure was "so

23   grave that it violate[d] contemporary standards of decency to expose anyone unwilling to such

24   risk." Helling, 509 U.S. at 36. The risk cannot be one that "today's society chooses to tolerate."

25   Id.  Prior to enacting the MCL, the State Water Resources Board estimated a total of 103 water

26   systems with 1,303,731 service connections statewide would be affected by the MCL.  Kern

27   County Taxpayers Ass'n v. Cal. State Water Res. Control Bd., No. 34-2017-80002769, 2019 Cal.

28   Super. LEXIS 15602, at *13 (Sac. Sup. Ct. Mar. 4, 2019.)  When the regulation went into effect

1   in 2018, many free individuals throughout California also had water that was out of compliance

2   with the new MCL. Id.

3          In light of the evidence submitted by Defendants, the burden shifts to Plaintiff to

4   demonstrate a genuine issue of material fact for trial. However, Plaintiff has offered no evidence

5   in opposition to Defendants' evidence, as he did not respond to their motion for summary

6   judgment.  Accordingly, Plaintiff has not and cannot establish the objective element of his

7   deliberate indifference claim and Defendants are entitled to summary judgment.

8          2.     Subjective Element-Knowledge of Substantial Risk of Serious Harm

9          "Deliberate indifference is a high legal standard," Toguchi v. Chung, 391 F.3d 1051, 1060

10  (9th Cir. 2004), and requires a "sufficiently culpable state of mind," Hearns v. Terhune, 431 F.3d

11  at 1040.  Defendant is only liable if he knew of an excessive risk of harm and disregarded the

12  risk.  Farmer, 511 U.S. at 838.  A defendant must be "aware of facts from which the inference

13  could be drawn that a substantial risk of serious harm exists, and [the defendant] must [] draw the

14  inference."  Id.  If the defendant did not know about the risk, he did not inflict the injury.  Id.

15         It is undisputed that at the time Defendant Shirley became Acting Warden at Wasco State

16  Prison in November 2020, CDCR and Wasco were already engaged in installing a GAC system to

17  bring Wasco State Prison into regulatory compliance—a process that began in August 2018.  (UF

18  36.)  During that process, CDCR worked to ensure it used the proper system to bring Wasco State

19  Prison's water into regulatory compliance. (UF 17-22, 24.) Ultimately, the plan to construct and

20  install the GAC system was approved. (UF 24-28.)  In addition, because the levels of TCP in

21  Wasco State Prison's water were not dangerous, there was no need to provide an alternative

22  source of drinking water. (DeGough Decl. ¶¶ 6, 23-25, Ex. A at 7-186; Cronjager Decl. ¶¶ 4, 6-7;

23  Shirley Decl. ¶ 9.)

24         It is further undisputed that as an Associate Warden, Defendant Cronjager supervised the

25  overall plant operations of Wasco State Prison's physical plant until he retired from CDCR in

26  December 2021. (UF 3, 40.)  Defendant Cronjager is not a water expert and thus it was not within

27  his duties and responsibilities to investigate or second guess the independent laboratory's findings

28  on TCP levels. (UF 41.) Nor was it within his duties and responsibilities to investigate or second

1    guess the State Water Resources Board's information concerning the risks of TCP exposure. (Id.)

2    Instead, Defendant Cronjager responded to the noncompliant TCP levels by supervising plant

3    operations, including the GAC system installation. (UF 40-41.)  Further, Defendant Cronjager

4    retired from CDCR over a year before Plaintiff arrived at Wasco State Prison and thus had no

5    duty to ensure that Wasco State Prison's water did not present an immediate danger to Plaintiff

6    during his incarceration at Wasco State Prison. (UF 3; Cronjager Decl. ¶ 8.)

7            Defendant DeGough's role as the Plant Manager in responding to the TCP levels in the

8    water was limited to preparing and submitting the GAC system project to the State Water

9    Resources Board and Facility Asset Management Branch. (UF 4, 20-23.) At that point, the GAC

10    system's approval and installation were outside of his role and responsibility. (UF 23.) And while

11    Defendant DeGough was listed as the point of contact on the quarterly notices, he did not choose

12    what information to include in the notices. (UF 39.) Rather, the notices are templates provided by

13    the State Water Resources Board—including the risks associated with TCP—and the TCP levels

14    are based on independent laboratory findings. (Id.) Thus, Defendant DeGough reasonably

15    responded to the noncompliant TCP levels by preparing and submitting the GAC system project

16    and by accurately reporting the independent laboratory findings and risks associated with TCP.

17            In sum, the undisputed evidence presented demonstrates that Wasco State Prison officials

18    did not ignore the issue but rather investigated and made reasonable attempts to resolve the issue.

19    Moreover, the evidence supports the finding that none of the Defendants were aware of any

20    serious risk of harm.  Farmer, 511 U.S. at 838.  Indeed, Defendants were informed by the State

21    Water Resources Board that the water was not dangerous.  (Shirley Decl. 9-10; DeGough Decl.

22    23-25; Cronjager Decl. 6-8.)  The quarterly notices that were posted indicated the levels of TCP

23    in Wasco's water did not present an emergency and there was no need to use an alternative water

24    source.  (DF 10-11; DeGough Decl. ¶ 6, Ex. A at 7-186; Cronjager Decl. ¶ 4.  Ultimately,

25    Defendants were never informed that the water was dangerous or that they should provide an

26    alternative source of water to prevent Wasco State Prison's inmates and staff from being harmed.

27    (DeGough Decl. ¶¶ 6, 23-25, Ex. A at 7-186; Cronjager Decl. ¶¶ 4, 6-7; Shirley Decl. ¶ 9.)

28

1    Accordingly, Defendants' motion for summary judgment should be granted.[4]

2                                              **IV.**

3                          **ORDER AND RECOMMENDATIONS**

4           Based on the foregoing, it is HEREBY ORDERED that the Clerk of Court shall randomly

5    assign a District Judge to this action.

6           Further, it is HEREBY RECOMMENDED that:

7           1.      Defendants' motion for summary judgment be granted; and

8           2.      Judgement be entered in favor of Defendants.

9           These Findings and Recommendations will be submitted to the United States District

10   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

11   (14) days after being served with these Findings and Recommendations, the parties may file

12   written objections with the Court, limited to 15 pages in length, including exhibits.  The

13   document should be captioned "Objections to Magistrate Judge's Findings and

14   Recommendations."  The parties are advised that failure to file objections within the specified

15   time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39

16   (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

17

18   IT IS SO ORDERED.

19   Dated:   **May 28, 2025**                 _____

20                                              STANLEY A. BOONE
                                               United States Magistrate Judge
21

22

23

24

25

26

27
     ───────────────
28   [4] Because the Court finds Defendants are entitled to judgment on the merits of Plaintiff's claim, the Court need not
     and does not address the issue of qualified immunity.

                                                  14